## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

**JAMES HARRISON MASSEY**

    **Plaintiff,**

v.

**COMPUTERSHARE LIMITED, and**
**COMPUTERSHARE US, and**
**COMPUTERSHARE LOAN SERVICES, and**
**BANK OF AMERICA, and**
**SPECIALIZED LOAN SERVICING, LLC,**

    **Defendants**

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

MAR 01 2021

JEFFREY P. COLWELL
CLERK

Case No. _____

## COMPLAINT IN A CIVIL ACTION

**NOW COMES,** Plaintiff **JAMES HARRISON MASSEY, Pro Se,** and for his complaint against the above-named Defendants, states as follows:

### INTRODUCTION

1.  This case arises from a shocking and alarming series of brazen and outrageous acts, actions and omissions, committed and omitted, involving Deception, Fraud, Aiding and Abetting, Misrepresentation, Embezzlement, Extortion, Conspiracy, Negligence, Breach of Fiduciary Duty, Deceptive Trade Practices, Outrageous conduct, Defamation/Libel, Malicious and Intentional Infliction of Emotional Distress, Unjust Enrichment, perpetrated by Defendant Specialized Loan Servicing, LLC, and the corporate entities of which SLS is either a part, or a subsidiary, and the parent corporate structures of which SLS is either a part or a subsidiary.

2.   In August 2019, in the context of providing the services of a third-party loan servicer for a home equity line of credit being offered to the Plaintiff through Bank of America, Defendant Specialized Loan Servicing, LLC, induced Plaintiff to send the Defendant a cashier's check in the amount of $25,849.76. Plaintiff reasonably believed and understood that the funds would be used to pay off Plaintiff's home equity line of credit.

3.   On August 30, 2019, preying on Plaintiff's complete trust and confidence, and lack of understanding and appreciation of the circumstances of the situation, in the pretext of providing the Plaintiff with essential pay-off information about Plaintiff 's home equity line of credit, SLS, acting individually, and, acting as an agent for Defendants, Computershare Loan Services, Computershare US, and Computershare Limited, solicited the Plaintiff for funds in the amount of $25,849.76, to be provided in the form of a cashier's check made payable to Specialized Loan Servicing, LLC.

4.   Contrary to the Defendant's promises and assurances, Plaintiff's cashier's check was not used to pay off Plaintiff's home equity line of credit, but instead, as is now being alleged by the Plaintiff, after the check was received by, and in the possession of the Defendant, due to gross negligence on the part of the Defendant the check was either lost or misplaced or, in the alternative, the check was either intentionally misappropriated, stolen, or embezzled by the Plaintiff and used for the personal and business profit and benefit of the Defendant and/or others affiliated with the Defendant.

5.   The Defendant lied about receiving Plaintiff's cashier's check and demanded that the Plaintiff send the Defendant another check in the same amount, or else, the Defendant threatened, derogatory credit information about the Plaintiff would be provided to various credit

Page - 2

reporting agencies, and foreclosure proceedings would be initiated against Plaintiff's home.

6. Based on the outrageous conduct and outright fraud perpetuated by the Defendant, Plaintiff 's credit and his personal reputation has been permanently besmirched, and he has been conned out of a cashier's check in the amount of $25,849.76. This lawsuit now follows.

### JURISDICTION and VENUE

7. The amount in controversy exceeds the jurisdictional minimum of this Court. At all times relevant to this complaint and alleged herein, one or more than one of the Defendants were residents of, or were doing business in the State of Colorado.

8. Venue is proper in this Court pursuant to 28 U.S. Code Section 1391(3)(d), as all of the Defendants are either corporations, or LLCs doing business throughout the State of Colorado.

### THE PARTIES

**PLAINTIFF:**

9. Plaintiff, **JAMES HARRISON MASSEY**, is a natural person, 77 years of age, who, at all times relevant to this complaint, was, and remains, a resident of the State of Kentucky, County of Warren, with the residential address: 440 Claypool Road, Alvaton, KY 42122.

**DEFENDANTS:**

**COMPUTERSHARE, LIMITED:**

10. An Australian based, multi-faceted, multi-pronged, multi-billion-dollar, international/global corporation, with a principal business address at 452 Johnston Street, Abbotsford, Melbourne, [Victoria], 3067, Australia, authorized, and doing business in The United States of America by and through its subsidiary Computershare, US.

**COMPUTERSHARE, US:**

11. A corporation, and a subsidiary of Computershare Limited, based in the United States of America, authorized, and registered to do business in the United States of America, and doing business in the United States of America with a principal business address at 6200 South Quebec Street, Greenwood Village, Colorado 80111.

## COMPUTERSHARE LOAN SERVICES, LLC:

12. A Limited Liability Company, and a subsidiary of Computershare, US, and a part of Computershare Limited, doing business in the United States of America by providing services which include loan servicing, with a principal business address at: 8742 Lucent Blvd, Suite 575, Highlands Ranch, [Littleton], Colorado 80129.

## BANK OF AMERICA:

13. A Global banking service, doing business in the State of Colorado, with several locations throughout The State of Colorado

## SPECIALIZED LOAN SERVICING, LLC:

14. A Limited Liability Company, and a subsidiary, and, "a part of Computershare Loan Services, LLC", and, a part of the Computershare Group, authorized to do business in the State of Colorado, with principal places of business addresses at: 8742 Lucent Blvd., Suite 300, Highlands Ranch, (Littleton), Colorado 80129, and, 6200 S. Quebec Street, Greenwood Village, CO 80111, and doing business in the state of Colorado.

### *Alter Ego Allegations*

15. Plaintiff is informed and believes, and, on that basis, alleges that at all times relevant to this complaint Defendant Specialized Loan Servicing, LLC, was an Alter Ego of Defendant Computershare Loan Servicing, who is in turn an Alter Ego of Computershare US, who in

turn is an Alter Ego of Computershare Limited.

16. On December 1, 2011, Computershare Limited publicly announced that it had "finalized the acquisition of Specialized Loan Servicing, LLC, a special fee-based servicer of residential mortgage loans".

17. Computershare Limited further announced that "SLS will now benefit from Computershare's core competence of stakeholder servicing and its top-quality customer service, communication and financial transaction processing infrastructure."

18. The CEO and President of Computershare, [Steve Rothbloom], also announced that, "The close of this deal means that SLS now has the support and increased bandwidth that comes from the backing of Computershare's global infrastructure."

19. John Beggins, SLS CEO, commented, "regulatory and other pressures are leading many US banks to consider outsourcing their mortgage servicing and identify sub-servicing solutions such as those provided by SLS." With the strength of Computershare behind us, we are positioned to become the standout servicing solution for all major US banks."

20. Defendant Specialized Loan Servicing LLC, advertised itself as "a part of Computershare Loan Services", thus reasonably giving the impression that, for all intents and purposes, the two corporate loan servicing entities are one and the same.

21. Plaintiff is informed and believes, and, on that basis alleges that at all times relevant to this complaint there existed a unity of interest and ownership between the Defendants such that any individuality and separateness ceased to exist between the said Defendants. See also *Warad W. LLC., v. Sorin CRM U.S., Inc., 119 F. Supp 3d 1294 (D. Colo. 2015).*

22. After finalizing the acquisition of SLS, Computershare CEO announced that, "SLS now

Page - 5

has the support and increased bandwidth that comes from the backing of Computershare's global infrastructure."

23. SLS CEO announced, "With the strength of Computershare behind us, we are positioned to become the standout servicing solution for all major US banks."

24. Computershare proclaimed that, "Computershare has a successful track record of integrating businesses ***that rely on Computershare's*** unique global customer service and data management infrastructure…' [Emphasis provided]

25. By Computershare's own admission, the subsidiaries of Computershare ***relied*** on Computershare for their individual existence.

26. Plaintiff is informed and believes, and, on that basis, alleges that Computershare, Computershare U.S., Computershare Loan Services, and Specialized Loan Servicing, LLC, have such a unity of interest and operations that separate personalities of these corporate structures no longer exists, and therefore, if the acts, actions and omissions of Specialized Loan Servicing, LLC are treated as being only those such acts, actions and omissions of SLS alone, an inequitable result will follow.

27. Plaintiff is informed and believes, and on that basis, alleges that these said Defendants have in the past, and now continue at all times relevant to this complaint, to transfer assets and revenues among and between themselves for purposes of their own individual profit, benefit and protection.

28. These Defendant corporate structures operate not as entities, but rather as one, with the separate corporations and LLCs used to shield assets and other revenues in a manner to best suit their owners.

29. These Defendant business structures are collectively the Alter Ego of each other, in that they all share some of the same ownership, management, and marketing.

30. It is neither uncommon nor illegal for a corporation to form a subsidiary corporation, or LLC, to protect its assets from liability arising from the subsidiary's independent actions. In such circumstances the corporate fiction and insulation from liability will be maintained only where the subsidiary and parent are truly indeed maintained as separate entities.

31. For purposes of this complaint all of the reasons and requirements for piercing the corporate veil and holding Defendant Computershare Loan Services liable in tort for the tortious acts, actions, and omissions of Defendant Specialized Loan Servicing, LLC, have been met and are fully satisfied. See *In re Phillips, 139 P. 3d 639 (Colo. 2006); Cherry Creek Card & Pastry Shop, Inc., v. Hallmark Marketing Corp., 176 F. Sipp. 2d 1091, 1097 (D. Colo. 2001).*

32. For purposes of this complaint, equity and justice demand that the corporate veil be pierced, the corporate fiction abandoned, and, under the theory of Alter Ego, Defendants Computershare Limited, Computershare US, Computershare Loan Services, all be held liable in tort for the tortious acts, actions and omissions done, and committed by the Defendant Specialized Loan Servicing, LLC. See *The Alter Ego Doctrine in Colorado, 28 Colo. Law. 53 (1999), In re Phillips, 139 p3d 639 (Colo, 2006)*

33. For purposes of this complaint, based upon the facts as they have been plead herein, the Plaintiff has demonstrated a prima facie case, and has met his burden of asserting the existence of alter ego sufficient to allow for this court to exercise jurisdiction over all of these Defendants as alter egos. See *First Horizon Merchant Services, Inc., v. Wellspring Capital Management, LLC, (166 P.3d 166 (Colo. App. 2007).*

34. Colorado courts have specifically found that, at a minimum, alter ego liability can be applied to Limited Liability Companies the same as it may be applied to corporations. See *Piercing the Corporate Veil of an LLC or a Corporation, 39 Colo. Law, 71 (2010).*

### *AGENCY:  AIDING and ABETTING and CONSPIRACY allegations*

*Holmes v. Young, 885 P.2d 305 (Colo. App. 1994),*
*Restatement (Second) of Torts, Section 876(b) (1977),*
*Jet Courier Service, Inc., v. Mulei 771 P.2d 486 (Colo. 1989).*

35. At all times relevant to this complaint, Defendants, and each of them, were acting as the agents, employees, and/or representatives of each other, and were acting within the course and scope of their agency and employment with the full knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts alleged in this Complaint.

36.  As members of the conspiracies alleged more fully below, each of the Defendants participated and acted with or in furtherance of said conspiracy, or aided or assisted in carrying out the purposes of the conspiracy, and have performed acts and made statements in furtherance of the conspiracy and other violations of Colorado law.

37. Each Defendant acted both individually and in alignment with the other Defendants with full knowledge of their respective wrongful conduct. As such, Defendants conspired together, building upon each other's wrongdoing, in order to accomplish the acts outlined in this Complaint.

38. Defendants are individually sued as principals, participants, aiders and abettors, and co conspirators in the wrongful conduct complained of and the liability of each arises from the fact

Page - 8

that each engaged in all, or in part, of the improper acts, plans, schemes, conspiracies, or transactions complained of herein.

<b><u>STATEMENT OF FACTS</u></b>

39. **In early 2000,** while then residing and working in the State of Colorado, Plaintiff was placed on disability inactive status by the Colorado Supreme Court.

40. After being placed on disability inactive status Plaintiff and his wife relocated to the state of Kentucky where they reside in a very modest home, living on a very modest and meager fixed income.

**A. <u>Plaintiff secured a mortgage and home equity line of credit from Bank of America.</u>**

41. After relocating to Kentucky Plaintiff secured a mortgage on his home, and a home equity line of credit through Bank of America.

42. At all times during the active terms of the mortgage and the home equity line of credit Plaintiff remained current and in full and complete compliance in every respect with regard to all of the terms and conditions of both the mortgage and the home equity line of credit.

**B. <u>Plaintiff's received notification from Bank of America that Specialized Loan Servicing would become the service provider for Plaintiff's home equity line of credit.</u>**

43. **On July 15, 2019,** Plaintiff received notice from Bank of America that, as of August 1, 2019, Specialized Loan Servicing, LLC, [SLS], would become the service provider for Plaintiff's home equity line of credit.

**C. <u>After doing an investigation Plaintiff becomes convinced that Specialized Loan Servicing is a dangerous, unethical, and unsafe company with which to do business.</u>**

44. Being unfamiliar with the Defendant, Plaintiff contacted the Better Business Bureau for

information, and based upon the information he received, Plaintiff immediately came to the

alarming conclusion that Specialized Loan Servicing, LLC, had an abysmal reputation, and was a

dangerous, unethical, and unsafe company with which to do business of any kind.

45. Plaintiff learned that over the past three years the Better Business Bureau listed 359

complaints against the Defendant, with 126 in the past 12 months.

46. The seemingly endless laundry list of complaints against the Defendant included theft,

unethical, illegal and fraudulent business practices, harassment, extortion, dishonesty, lacking in

integrity, lying, false credit reporting, embezzlement, and much, much more.

47. Plaintiff made the decision to forth-with sever any and all relationships of any and every

kind with the Defendant.

**D.  Plaintiff requested that SLS send him a pay off statement for the home equity line of
credit.**

48. **On August 22, 2019,** plaintiff contacted the Defendant and requested a payoff statement

for Plaintiff's home equity line of credit.

**E.  Defendant sent Plaintiff a pay-off statement and induced Plaintiff to send a certified
check in the amount of $25,849.76.**

49. **On August 23, 2019,** Plaintiff received a fax transmission, [which served as a pay-off

statement], from the Defendant showing the payoff amount of Plaintiff's home equity line of

credit as being $25,849.76.

50. The pay-off statement further indicated that the payoff amount of $25, 849.76, would be

good until September 23, 2019, and, that the funds **must** be in the form of a cashier's check or

wire transfer, and should be sent to: Specialized Loan Servicing, LLC, 8742 Lucent Blvd, Suite

300, Highlands Ranch, (Littleton), Colorado 80129. [Emphasis provided].

**F.  Plaintiff sent the Defendant a cashier's check in the amount of $25,849.76.**

51. **On August 27, 2019,** Plaintiff made arrangements with South Central Bank of

Bowling Green, Kentucky, and received a cashier's check, [check no: 042277], in the amount of

$25, 849.76 for the purpose of paying off Plaintiff's home equity line of credit.

52. The number 102010332 was the number by which the Defendant identified the

account for Plaintiff's home equity line of credit.

53.  **On August 27, 2019,** plaintiff placed cashier's check number 042277, in the

U.S. Mail, postage pre-paid, certified, with tracking no:7019 0140 0000 5017 4618, addressed to

Specialized loan Servicing, LLC, 8742 Lucent Blvd, Suite 300, Highlands Ranch, (Littleton),

Colorado 80129.

54.  U.S. Postal service tracking records indicate that on August 30, 2019, at 10:49 AM, the

cashier's check was delivered to the front desk, reception area, at 8742 Lucent Blvd, Suite 300,

Highlands Ranch, (Littleton), Colorado, 80129, where it was received, accepted, and signed for

by a person who, either expressly, verbally, or, impliedly, indicated that they were either an

agent, an employee, or, an authorized representative of the Defendant, who was authorized to

receive and accept the cashier's check.

**G.  Defendant received and accepted Plaintiff's cashier's check \***

55. **On August 31, 2019,** the next day after United States Postal records reflect that

Plaintiff's cashier's check was delivered to, received, accepted and signed for by the Defendant,

Plaintiff received a notice from the Defendant indicating that payment was due on Plaintiff's

home equity line of credit.

56. **On September 17, 2019,** Plaintiff placed a telephone call to [800-306-6062], which was

a telephone number that the Defendant had provided as being Defendant's business contact

number.

57. During the telephone call with a person who did not identify themselves either by name

or by company position, Plaintiff inquired about the status of the cashier's check, and about why

he had received a past due notice for the home equity line of credit that was now paid off in full

and no longer active.

**H.  Defendant lied and told Plaintiff that the cashier's check had not been received.**

---

\*UCC Section 2-509. Risk of Loss in the Absence of Breach

    (1)  Where the contract requires or authorizes the seller to ship the goods by carrier

    (b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, **the risk of loss passes to the buyer when the goods are there duly tendered as to enable the buyer to take delivery. [emphasis provided]**

58. Defendant told the Plaintiff that the cashier's check had not been received and therefore

Plaintiff's home equity line of credit account remained active and delinquent.

59. Even after being provided with U.S. Postal Service proof of delivery, the Defendant

continued to deny that the Plaintiff's cashier's check had been delivered and received.

**I.    Plaintiff embarked on a mission to determine the status of the cashier's check.**

60.    After the September 17, 2019, telephone call to the Defendant, the Plaintiff made

numerous unsuccessful attempts to contact the Defendant still seeking information about the

status of the cashier's check and the home equity line of credit.

**J.    Defendant refused to give Plaintiff any information about the cashier's check.**

61.    The Defendant was very uncooperative, rude and evasive, and, other than continuing to

deny that the check had been delivered and received, refused to provide Plaintiff with any

information what-so-ever about either the status of the cashier's check, or the location of the

check.

62.    Plaintiff's telephone calls to the Defendant were routinely transferred from one

unidentified person to another, with all such individuals being entirely uncooperative and

evasive, and, other than continuing to deny that the check had been delivered and received,

refused to give the Plaintiff any information what-so-ever about either the status or location of

the cashier's check.

63. Ignoring overwhelming and indisputable proof to the contrary, Defendant continued to

vehemently deny that Plaintiff's cashier's check had been delivered to the Defendant, and

received and accepted by the Defendant on August 30, 2019.

**K.  Defendant retracts its lie and admits that the cashier's check was delivered and received**

64. **On November 14, 2019,** Defendant admitted to the Plaintiff that Defendant received

Plaintiff's cashier's check on August 30, 2019.

**L.  Defendant substitutes the lie with an unbelievable claim that the cashier's check was "lost"
or "misplaced" after it had been received on August 30, 2019.**

65. The Defendant claimed that after Plaintiff's check was delivered to, received, and

accepted by the Defendant, and while then in the Defendant's possession, the check was "lost" or

"misplaced" and "could not be located". **Reference *Uniform Commercial Code Section 3-312,***

***Lost, Destroyed, or Stolen Cashier's.* \***

**M.  Defendant did not conduct a search for the alleged "lost" or "misplaced" cashier's
check.**

———————————————

\*UCC Section 3-312, Lost, Destroyed, or Stolen Cashier's Check.

(b) A claimant may assert a claim to the amount of a check by a communication to the obligated bank,
describing the check with reasonable certainty and requesting payment of the amount of the check, if (i)
the claimant is the drawer, or payee of a certified check, or the remitter of payee of a cashier's check or
teller's check, (ii) the communication contains or is accompanied by a declaration of loss of the claimant
with respect to the check, (iii) the communication is received at a time and in a manner affording the bank
a reasonable time to act on it before the check is paid, and (iv) the claimant provides reasonable
identification if requested by the obligated bank. Delivery of a declaration of loss is a warranty of the
truth of the statements made in the declaration. If a claim is asserted in compliance with this subsection,
the following rules apply:

(1) The claim becomes enforceable at the later of (i) the time the claim is asserted, or (ii) the 90th day
following the date of the check, in the case of a cashier's check or teller's check, or the 90th day following
the date of the acceptance, in the case of a certified check…

66. There is no information available to indicate or suggest that the Defendant at any time

conducted a search of any kind for the "lost" or "misplaced" check.

**N.  Defendant did not contact South Central Bank to assert a claim to the amount of the alleged "lost" or "misplaced" cashier's check as provided for under the UCC.**

67. There is no information indicating or suggesting that the Defendant, as the named payee

of the cashier's check, contacted the obligated bank, South Central Bank in Bowling Green,

Kentucky, to assert a claim to the amount of the check.

**O.  Defendant did not file a report with local law enforcement about a "stolen" cashier's check.**

68. Local law enforcement [Douglas County Sheriff's Department, Highlands Ranch,

Colorado], has advised that there is no record of the Defendant ever filing any report about a

"stolen" or "misplaced" cashier's check.

**P.  Defendant demanded that the Plaintiff send another cashier's check in the amount of $25,849.76, as a replacement for the alleged "lost" or "misplaced" cashier's check.**

69. After acknowledging that Plaintiff's cashier's check was in fact received on August 30,

2019, the Defendant has thereafter taken the unfathomable position that because the Defendant

"lost" or "misplaced" Plaintiff's check after it was received and accepted, the Plaintiff's home

equity line of credit was therefore not paid off, and, the account is now past due and delinquent.

70. Defendant advised the Plaintiff that in order to correct the situation of the past due,

delinquent account, it would be necessary for the Plaintiff to send the Defendant a second

[additional] check in the same amount [$25,849.76] as the check that the Defendant claimed to

have "lost" or "misplaced". **Reference *Uniform Commercial Code Section 2-509 (b) Risk of***

*Loss in the Absence of Breach, [ id Letter H page – 12].*

**Q.** **Defendant threatened to provide derogatory credit information about the Plaintiff.**

71. The Defendant "advised", [a veiled threat], the Plaintiff that if the Plaintiff did not send a

second cashier's check, [in the amount of $25,849.76], or, if the Plaintiff did not pay the amounts

indicated as now being past due, and, continue making regular principal payments to the

Defendant, the Defendant would provide derogatory information about the Plaintiff to various

credit reporting agencies, and, would enter default against the Plaintiff, and initiate Foreclosure

proceedings.

72. The Plaintiff did not agree to either send the Defendant a second cashier's check in the

amount of $25, 849.76, or, to continue making regular principal payments on the [paid off] home

equity line of credit.

**R.** **Defendant followed through on the threat to provide derogatory credit information about Plaintiff.**

73. In response to the Plaintiff's refusal to capitulate to the Defendant's Demands, the

Defendant followed through on the threats, and continued to provide derogatory credit

information about the Plaintiff to various credit reporting agencies.

74. The Plaintiff became increasingly overwhelmed by the ever-present stress associated

with the Defendant's malicious and outrageous actions, and the looming threat of facing

financial ruin and foreclosure on his home.

**S.** **Defendant continued to attempt to extort payment of some kind from the Plaintiff.**

75. The Defendant continued in its absolute refusal to provide the Plaintiff with any information of any kind about the alleged "lost", or "misplaced" cashier's check, and also continued to provide derogatory credit information about the Plaintiff to various credit reporting agencies, and, to reiterate the threats of foreclosure.

76. The weight of the continuing threats and fear of foreclosure on his home completely dominated and controlled the Plaintiff's life and left him feeling driven to the brink of absolute emotional collapse.

77. Plaintiff contacted the Consumer Financial Protection Bureau, to no avail, which seemed to result in infuriating the Defendant, strengthening and embolden its resolve and determination to continue undeterred and unrestrained with its malicious and destructive behavior.

**T.  Plaintiff' suffered physical and emotional distress resulting from Defendants oppressive and outrageous conduct.**

78. Because of the Defendant's oppressive and outrageous conduct the Plaintiff's health deteriorated significantly and in early January, 2020, he was admitted to a local hospital, [Greenview Hospital, Bowling Green, Ky.], under emergency conditions, where he received emergency medical care and treatment for causes and conditions that included stress-based causes and complications.

**U.  Plaintiff felt that he had no choice but to capitulate to Defendant's demands.**

79. Out of sheer desperation and a desire to survive, physically, financially and emotionally,

Plaintiff felt that he was left with no alternative but to capitulate to the Defendant's coercive and

threatening demands to send the Defendant a second cashier's check in the amount of

$25,849.76.

80. Even though feeling fearful that doing so would expose him to an even greater risk of

financial loss and harm, the Plaintiff contacted his bank and inquired about placing a stop pay on

the cashier's check and sending the Defendant a second ["replacement"] check. *

### V. **Plaintiff's bank required that an indemnification agreement be executed.**

81. Plaintiff's bank advised him that it would be necessary for either the Plaintiff or the

Defendant to sign an indemnification agreement if the bank agreed to place a stop pay on the

cashier's check.

### W. **Defendant refused to sign an indemnity agreement as required by the bank.**

82. Defendant SLS, refused to agree to sign an agreement to indemnify the bank against

possibly future liability that could reasonably result from placing a stop pay on the cashier's

check that the Defendant claimed to have been "lost" or "misplaced"

### X. **Defendant sent the Plaintiff a Notice of Default and Intent to Foreclose.**

83. **On April 2, 2020,** Plaintiff received a Notice of Default and Intent to Foreclose from the

Defendant.

---

*Under the provisions of the UCC, Sections 3-312 and 3-411, stop payments are not permitted on
cashier's checks, however, the obligated bank may refuse to pay, however, a bank that refuses to honor its
cashier's check may be exposed to potentially significant liability, including consequential damages. To
protect against potential liability it is not uncommon for a bank to require a bond, or indemnification
agreement when considering stopping pay on a cashier's check.

**Y.  <u>Plaintiff made arrangements to send Defendant a second cashier's check.</u>**

84. Faced with the imminent threat of foreclosure and mounting past due balances, and

feeling helpless and powerless against the enormous financial power and clout of the Defendants

and their army of agents and defenders, acting entirely against his will, the Plaintiff made

arrangements with his bank to assist him sending the Defendant a second cashier's check in the

amount, [$25, 849.76]. Plaintiff now has an outstanding loan with his bank for $25, 000.00.

**Z.  <u>Plaintiff received Notice from the Defendant that his home equity line of credit was in
"serious default".</u>**

85. **<u>On February 2, 2021,</u>** the Plaintiff received correspondence from Defendant Specialized

Loan Servicing advising the Plaintiff', "According to our records, the above-referenced

mortgage loan is in serious default". The Defendant also ["offered"], "mortgage relief options",

"alternative payment plans", "loan modification", "short sale or deed -in-lieu of foreclosure".

86. The Defendant has not provided the Plaintiff with any information whatsoever about the

status of the Plaintiff's alleged "lost", "stole" or "misplaced", "and could not be found",

cashier's check, and, the Defendant has not provided even a mention of the circumstances of

how the Plaintiff's cashier's check became "lost", "stolen" or "misplaced and could not be

found".

## <u>BACKGROUND STATEMENT OF THE CASE</u>

This case is about a conspiracy to perpetrate a fraud (scam), against an elderly, impecunious, disabled military Veteran, (100% -service connected), in violation of CRS 18-18-6.5, and 18-6.5-102(10), Title 42 Chapter 21 USC, and Title VII of the Civil Rights Act of 1964, as amended.

At all times relevant to each and every fact, claim, or assertion set forth, or alleged herein this complaint, the Defendants, and each of them, at all times, acted as one, in concert, and in complete, full and absolute support of each other, with Bank of America also acting as the eyes and ears, providing useful information for potential scam victim identification.

**CAUSES OF ACTION**

### FIRST CAUSE OF ACTION
### FRAUD IN INDUCEMENT
### (Against all of the Defendants)

87. Plaintiff hereby incorporates by reference each of the paragraphs set forth above as though fully set forth verbatim hereafter.

88. The Defendants conspired to perpetrate a fraud (scam) against the Plaintiff who is an elderly, disabled, Viet Nam era-military Veteran, honorably discharged after eight-years of active service, who has been classified by the Veterans Administration as being 100% disabled due to service-connected circumstances and conditions.

89. Under Colorado law, fraud is a civil cause of action arising where one party creates a false impression that another party relies upon, and, as a result of that reliance, suffers an injury.

90. A fraud can be either active or passive, and fraud in inducement specifically refers to a form of trickery used to induce someone to enter into an agreement that was to their disadvantage.

91. On August 30, 2019, while acting in concert with Computershare Limited, Computershare US, and Computershare Loan Services, Defendant, Specialized Loan Servicing, LLC, misrepresented to the Plaintiff that Plaintiff's cashier's check in the amount of $25, 849.79 would be used for the purpose of paying off the Plaintiff's home equity line of credit.

92. The facts, as they have been put forth herein above, describing in detail the nature of the Defendant's acts, and actions, to include; (a) the lies about not receiving the check, (b) the refusal to provide material information about the status of the check, (c) the failure to conduct any investigation into the where-abouts of the check, (d) failure to file a report with local law

enforcement, (e) the failure to contact the bank and demand payment, (f) the refusal to sign an
indemnification agreement as required by the bank to issue a replacement check, when
considered individually, and/or collectively, command recognition and acceptance, and demand
the reasonable and logical conclusion that;

93. It was Defendant's intent to create the false impression that the Plaintiff's cashier's check
would be used to pay off Plaintiff's home equity line of credit, and;

94.  It was Defendant's intent that the Plaintiff rely to his detriment on Defendant's false
impressions regarding the purpose for the cashier's check.

95. The Defendant knew at all times that the Plaintiff's cashier's check would not be used to
pay off Plaintiff's home equity line of credit, and it was never the Defendant's intent that the
check be used to pay off Plaintiff's home equity line of credit.

96. The Plaintiff did in fact rely to his detriment on the false impressions created by the
Defendant regarding the purpose for the cashier's check.

97. A desire to pay off the home equity line of credit pushed the Plaintiff to act and send the
Defendant a cashier's check in the amount of $25,849.76.

98.  As a direct and proximate result of Plaintiff's reasonable reliance on the Defendant's
misrepresentations and false impressions regarding the purpose for the cashier's check, Plaintiff
has suffered financial harm and other damages, to include loss of his cashier's check.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

### SECOND CAUSE OF ACTION
### FRAUD, DECEIT AND FRAUDULENT MISREPRESENTATION
### (As against all of the Defendants)

99. Plaintiff hereby incorporates by reference each of the paragraphs set forth herein above as

though fully set forth verbatim herein this paragraph and hereafter.

100.    Defendant, Specialized Loan Servicing, LLC, while acting with the full
knowledge, consent, approval, and support of co-Defendants, Computershare, Computershare
US, and Computershare Loan Services, LLC, represented to the Plaintiff that the said Defendants
would act on Plaintiff's behalf, and act in Plaintiff's best interest with regard to the servicing of
Plaintiff's home equity line of credit.

101.    Specialized Loan Servicing, LLC, represented to, and, assured the Plaintiff, that if
the Plaintiff sent the Defendant a cashier's check in the amount of $25,849.76, the Defendant
would use the said cashier's check for the specific purpose of paying off Plaintiff's home equity
line of credit.

102.    The weight of the evidence supports the reasonable and logical conclusion that the
representations that the Defendants made to the Plaintiff were indeed false and untrue
representations, and, the Defendant knew that the representations were false and untrue at the
time when they were being made.

103.    The weight of the evidence as set forth herein, expressly supports the reasonable
and logical conclusion that, by the Defendants' words, conduct, and actions, it was their express
intent and desire, collectively, to create an untrue and/or, a misleading impression in the mind of
the Plaintiff such that it would cause the Plaintiff to believe that if the Plaintiff sent the
Defendants a cashier's check in the amount of $25,849.76 that check would be used for the
specific purpose of paying off Plaintiff's home equity line of credit.

104.    Defendants knew at the time that the untrue words and deceitful actions, as those
words and actions have been portrayed and demonstrated by the facts as set forth herein, created

a false impression in the mind of the Plaintiff, therefore, as is demonstrated by a preponderance

of the evidence, the Defendants are guilty of having committed a fraud. See *Corder v. Laws, 148*

*Colo. 310, 366 P.2d 369 (1961); Denver Business Sales Co, v. Lewis, 148 (C0l0 293, 365 P2d*

*895 (1961), Otis & Co., v. Grimes, 97 Colo 219, 221-22, 48 P 2d 788, 789 (1935).*

105.     The Defendants' conduct and words, whether written or oral, were in fact, and in

reality, false representations, and those false representations created an untrue and misleading

impression in the mind of the Plaintiff thereby causing him to reasonably believe that if he sent

the Defendant a cashier's check in the amount of $25, 849.76, that cashier's check would be

safeguarded upon receipt by the Defendants, and, would be used for the specific purpose of

paying off the Plaintiff's home equity line of credit. See *Cahill v. Readon, 85 Colo, 9, 14, 273 P.*

*653, 655 (1928),*

106.     The Defendants made the false, and, materially false representations, with the

knowledge that they were false at the time when they were being made, for the purpose of

distracting from, camouflaging and concealing the true purpose of the false representations, and

with the intent of causing the Plaintiff to rely, and act upon the false representations, and, by

those acts, actions, omissions, committed and omitted, the Defendants are guilty of deceit.  See

*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)*

107.     Defendants were at all times aware that it was a substantial likelihood that the

Plaintiff would rely to his detriment on the Defendants' material misrepresentations.

108.     **On August 27, 2019**, acting to his detriment and reasonably relying on the false

representations made by the Defendants, the Plaintiff sent the Defendants a cashier's check in the

amount of $25, 849,76. See *Frontier Expl., Inc. v. Am. Nat'l Fire Ins.*

*Co., 849 p 2d. 887 (Colo. App. 1992).*

109.    **On August 30, 2019, at 10:49 am,** the cashier's check that Plaintiff sent to Defendant Specialized Loan Servicing, LLC, was delivered to, received and accepted by the Defendant at the Defendant's business location at 8742 Lucent Blvd., Suite 300, Highlands Ranch, (Littleton), Colorado 80195. The check was signed for by an agent or authorized representative of the Defendant.

110.    Contrary to the false promises and assurances that the Defendants deceitfully instilled in the mind of the plaintiff regarding the safe keeping of Plaintiff's cashier's check, after the Plaintiff's cashier's check was received, the Defendant either negligently, failed to take reasonable and appropriate actions to assure that the check was properly safeguarded and protected, or, in the alternative, the Defendants deliberately, knowingly, wantonly, either embezzled, or misappropriated the check.

111.    The Plaintiff's cashier's check was not used for the purpose of paying off the Plaintiff's home equity line of credit even though the Defendant had fraudulently represented to the Plaintiff that it would be used for that purpose.

112.    The Plaintiff did not realize the benefit that he was led to believe that he would realize if he sent a cashier's check to the Defendant in the amount of $25,849.

113.    Contrary to the false representations made by the Defendants, the Plaintiff's cashier's check was not used for the purpose of paying Plaintiff's home equity line of credit, but instead it was either embezzled, misappropriated, stolen, lost or misplaced, all to the detriment, loss, harm, and damage to the Plaintiff.

**WHEREFORE** Plaintiff prays for relief as set forth below.

### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (As against all of the Defendants)

114.     Plaintiff hereby incorporates by reference each of the paragraphs set forth above

as though fully set forth verbatim herein this paragraph and hereafter.

115.     The indisputable facts as set forth herein, overwhelmingly show that at all times

relevant to this complaint a fiduciary relationship existed between the Plaintiff and the

Defendants, each and all of them.

116.     "A fiduciary relationship exists between two parties when one of them is under a

duty to act for or to give advice for the benefit of another upon matters within the scope of the

relationship" See *Moses v. Diocese of Colorado, 863 P 2d 310, 321 (Colo. 1993).*

117.     A fiduciary's obligation to the beneficiary includes a duty to exercise reasonable

care and skill. See Destefarno v. Grabian, 763 P.2d 275 284 (Colo 1988).

118.     Reasonable care is that degree of care which a reasonably careful person would

use under the same or similar circumstances. See *Blankette v. Public Service Co., 90 Colo 456,*

*10 P.2d 327 (1932)(dictum); Restatement (Second) of Torts Section 283 (1965)*

119.     A fiduciary duty arises from the contract and an independent general duty of care.

See *Colorado Dep't of Transp. V. Brown Group Retail, Inc., 182 P.3d 687, 690-91 (Colo 2008).*

120.     Breach of a fiduciary duty is an action that can lie in tort. See *Restatement*

*(Second) of Torts Section 874 cmt.b*

121.     A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious

conduct to the person for whom he should act. See *Destefano 763 P.2d at 284.*

122.    One standing in a fiduciary relationship with another is subject to liability to the other for harm resulting from a breach of the duty imposed by the relationship. See *Moses, 863 P.2d at 319.*

123.    The relationship that existed between the Plaintiff and the Defendants was that of borrower (the Plaintiff), and loan servicer of the loan for which the Plaintiff bore responsibility of repayment.

124.    Pursuant to the mandates and prohibitions that are set forth and outlined in 12 U.S.C. 2609, Real Estate Settlement Procedures Act, a fiduciary relationship existed between the Plaintiff, as a borrower, and the Defendants as servicers of Plaintiff's mortgage loan.

125.    A person who services a residential mortgage loan may not directly, or indirectly;

(a) Employ any devices, schemes or artifice to defraud another person, (b) Knowingly make an untrue statement of a material fact or omit a material fact that is necessary to make the person's statement true in light of the circumstances in which the person makes the statement, (c) Engage in any act, practice or course of business that operates or that the person intends to operate as a fraud or deceit upon another person,

126.    A fiduciary duty arises when "there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence" See *Curl v. Key, 311 N.C. 259, 264, 316 S.E. 2d 272, 275 (1984).*

127.    The irrefutable facts as set forth above, demonstrate clearly and conclusively that by the Plaintiff's act of entrusting a cashier's check in the amount of $25,849.76 with the Defendant, and relying upon the Defendants to properly protect and use the check for its

Page - 26

intended purpose, that act alone not only suggests, but overwhelmingly shows by a

preponderance of the evidence that the Plaintiff reposed special confidence in the Defendants

sufficient to create a fiduciary relationship between the Plaintiff and the said Defendants.  See

*Mintz v. Accident & Injury Med. Specialists, PC, 284 P.3d 62, 68 (Colo. App. 2010)*

128.    At all times relevant to this complaint the Defendants were acting as a fiduciary of

the Plaintiff with regard to all matters relating to the servicing of Plaintiff's home equity line of

credit. See *Application for Water Rights of Town of Mintura, 2015 CO 61, Paragraph 11, 359 P.*

*3d 29, 31.*

129.    The Defendants breached their fiduciary duty by willfully, wantonly, deliberately

and intentionally either misappropriating the Plaintiff's cashier's check, or, embezzling the

Plaintiff's cashier's check and using it for their own personal benefit and gain.

130.    In the alternative, the Defendants breached their fiduciary duty be failing to

exercise the care and skill that an ordinary prudent person would use in protecting and preserving

his or her own interests or property.

131.    As a direct result of the Defendants' breach of their fiduciary duty,

the Plaintiff has been caused to suffer damages, which include, embezzlement, theft, loss,

misappropriation or other permanent loss of Plaintiff's cashier's check in the amount of $25,

849.76, in addition to other damages related to Plaintiff's emotional and physical health,

reputation, both financial and personal, credit, and other.

**WHEREFORE** Plaintiff prays for relief as set forth below.

### FOURTH CAUSE OF ACTION
### NEGLIGENCE
### BREACH OF DUTY TO EXERCISE REASONABLE CARE
### BREACH OF DUTY TO EXERCISE DUE DILIGENCE
### (As Against all of the Defendant)

132.    Plaintiff incorporates by reference each of the paragraphs set forth above as though set forth verbatim below.

133.    It is well accepted law that in an ordinary lender-borrower relationship, the lender does not owe any duty to its borrower beyond the terms of the loan agreement. See *Wells Fargo Bank, N.A. v. Vandorm, 2012 NCBC 6 N.C. Super Ct. January 17, 2012, Kham & Nate's Shoes No. 2, Inc., v. First Bank of Whiting, 908 F.2d 1351, 1357, (7th Cir. 1990).*

134.    The facts of Plaintiff's case demand reaching the reasonable conclusion that the Plaintiff clearly reposed trust and confidence in Bank of America's commitment and good faith duty to exercise reasonable care in the handling of Plaintiff's home equity line of credit, and in so doing, to act in the Plaintiff's best interest and not in the self-interest of Bank of America.

135.    The relationship that existed between Bank of America and the Plaintiff regarding Plaintiff's home equity line of credit subsumes the duty of reasonable care, and placed a duty on Bank of America to act with respect to the handling and management of Plaintiff's home equity line of credit in the same manner it would have handled and managed it if Bank of America had been the borrower instead of the lender.

136.    Bank of America either sold, or by some means, transferred the servicing of Plaintiff's home equity line of credit to Specialized Loan Servicing, LLC, in so doing Bank of America acted well within its legal authority and right.

137.    When entering into the arrangement with Specialized Loan Servicing, Bank of America was under a good faith duty and obligation to exercise due diligence and to exercise reasonable care by first taking reasonable precautions for the purpose of determining and ascertaining that selling or transferring the servicing of Plaintiff's home equity line of credit to

Specialized Loan Servicing would not result in harm to the Plaintiff.

138.     Bank of America breached its duty to act in good faith, failed to exercise reasonable care, and failed to exercise due diligence when it sold, or transferred, the rights to service Plaintiff's home equity line of credit to Specialized Loan Servicing, LLC.

139.     Specialized Loan Servicing, LLC, has a well published reputation for having hundreds of complaints filed against it.

140.     Better Business Bureau information reveals that SLS has a consumer rating of 1.2/5, and, "consumers are mostly dissatisfied."

141.     Consumer complaints contain statements such as the following: "deceptive practices", "erroneous fees", "not honoring what they tell me.", "caveat, never use this service", "most malicious, fraudulent out there", tried to call, can't talk to a person", "paid my loan off but they still refuse to release the lien", "threatened me to either do a short sale or give them a deed in lieu of foreclosure", most deceitful, unprofessional, unethical company I have ever had to deal with.", among other numerous and similar complaints.

142.     Information suggests that consumer complaints against Specialized Loan Servicing, LLC, average more than ten (10) per month.

143.     In light of the enormous amount of public information expressing the unfitness, dishonesty, untrustworthiness, deceitfulness, unprofessionalism, malicious, fraudulent, oppressive, outrageous, deceptive trade practices, of Specialize Loan Servicing, LLC, and its parent corporations, and Bank of America's extensive history of prior relationships with SLS, it is axiomatic that Bank of America knew, or had good reason to have known, that if Bank of America sold, or transferred, the right to service Plaintiff's home equity line of credit to the

Defendant, it was more likely than not that the Plaintiff would suffer harm. See *Chutich v. Samuelson, 33 Colo. App. 195, 201, 518 P.2d 1363, 1367 (1973)*

144.     Bank of America owed a duty to act in Plaintiff's best interest and not in the self interest of Bank of America. Bank of America breached the duty that it owed in every regard.

145.     Bank of America also breached its duty to exercise due diligence, and reasonable care, and, as a direct and proximate result of such breach, and/or, of such breaches, Plaintiff has suffered harm and damages in the form of financial and economic harm, [loss of Plaintiff's cashier's check in the amount of $25,849,76], destruction of his ability to access credit competitively, physical and emotional harm and distress, and more.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

**FIFTH CAUSE OF ACTION**
**FRAUDULENT CONCEALMENT**
**(As against all of the Defendant)**

146.     Plaintiff incorporates by reference each paragraph set forth above as though set forth verbatim herein this paragraph and all paragraphs below.

147.     The Defendants knowingly, intentionally, willfully and wantonly repeatedly lied about receiving the cashier's check, and also knowingly, intentionally, willfully, and wantonly, engaged in other deceitful, evasive, secretive and covert actions for the purpose of concealing from the Plaintiff the location and whereabouts of Plaintiff's cashier's check. See *Morrison v. Goodspeed, 100 Colo. 470, 68 P.2d 458 (1937)*.

148.     The facts overwhelmingly support the reasonable and logical conclusion that the Defendants' intent was to cause the Plaintiff to act differently than he might have otherwise acted if the information about the receipt, status, location and whereabouts of the cashier's check

had been truthfully disclosed.

149.    As a direct and proximate result of the Defendants' acts of fraudulently

concealing the fact that the Plaintiff's cashier's check was received at the time when it was

actually received, and subsequently knowingly, intentionally, and deliberately concealing the

status, the location, and the whereabouts of the check, the Plaintiff has been caused to suffer

harm and damages, to include loss of use, value and benefit of the cashier's check in the

amount of $25,849.76, and other and further related and identifiable harm.

**WHEREFORE,** Plaintiff prays for relief as set forth below.

### SIXTH CAUSE OF ACTION
### EMBEZZLEMENT
### (As against all of the Defendants)

150.    Plaintiff incorporates by reference each of the paragraphs set forth above as

though set forth verbatim herein this paragraph 150, and all following paragraphs.

151.    On August 23, 2019, the Plaintiff and the Defendants entered into an

agreement for the Plaintiff to send the Defendant, SLS, a cashier's check in the amount of $25,

849.76, to be used for the specific purpose of paying off the Plaintiff's home equity line of credit.

152.    After Plaintiff's cashier's check was received by Defendants, SLS on August 30,

2019, the Defendants, and each of them, engaged in, and/or acted in furtherance of a

premeditated scheme to embezzle Plaintiff's cashier's check, and, the Defendants did in fact

embezzle Plaintiff's cashier's check in the amount of $25,849.76.

153.    Colorado Revised statutes, Section 18-4-403, defines embezzlement as a crime

involving the theft or misuse of money or property from another, generally by a person in

a position of trust.

154.     The United States Supreme Court has defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in that the original taking was lawful, or with the consent of the owner, while in larceny the felonious intent must have existed at the time of the taking. See *Moore v, United States, 160 U.S. 268, 269 (1895)*

155.     As the principals, and/or, as subsidiaries of Defendant Specialized Loan Servicing, LLC, Defendants, Computershare, Computershare US, and Computershare Loan Services, were each either fiduciaries or other of SLS, and as such, based upon their respective relationships with the Plaintiff, were each in positions of trust with regard to all matters concerning and related to servicing Plaintiff's home equity line of credit.

156.     **On August 27, 2019,** as the facts now show, Plaintiff sent the Defendant Specialized Loan Servicing, LLC, a cashier's check in the amount of $25,849.76, with the specific instructions, and with the intent that the check be used only for the specific purpose of paying off Plaintiff's home equity line of credit.

157.     **On August 27, 2019,** a debtor-creditor relation did exist between the Plaintiff and the Defendant, however, the Plaintiff sent the cashier's check to the Defendant to be used for the specific purpose of paying off Plaintiff's home equity line of credit, and, it was not intended to be used for any other purpose.

158.     **On August 30, 2019, at 10:49 am,** as the facts now show, Defendant, SLS received Plaintiff's cashier's check and took the check into the Defendant's possession with full knowledge at that time that the Plaintiff's intent, purpose, and understanding was that the check

would be used for the specific purpose of paying off Plaintiff's home equity line of credit, and for no other purpose or reason.

159.    When the Plaintiff later inquired about the status of the cashier's check, though having first-hand knowledge that the check had been received, and knowing precisely when it had been received, the Defendant intentionally and deliberately lied and told the Plaintiff that the check had not been received.

160.    The Defendant continued to intentionally and deliberately lie about receiving Plaintiff's cashier's check.

161.    **On November 14, 2019,** the Defendant finally admitted to the Plaintiff that the cashier's check had been received by the Defendant on August 30, 2019, at 10:49 am, however, the Defendant alleged, after the check had been received it was thereafter either "lost" "stolen" or "misplaced" and "could not be found."

162.    The Defendant did not contact the obligated bank, South Central Bank in Bowling Green, Kentucky, for the purpose of delivering a declaration of loss, and asserting a claim against the check as provided for by the Uniform Commercial Code, Section 3-312, which deals with lost, destroyed or stolen cashier's checks.

163.    The Defendant refused to cooperate with South Central Bank in fulfilling the bank's requirements for placing a stop pay on the alleged lost, stolen or misplaced cashier's check, as recommended by the Uniform Commercial Code, section 3-411. [the requirement or common banking practice for a bond, or indemnification agreement].

164.    The unassailable facts provide clarity with regard to the Defendant's actions, and offer proof that the Defendant acted with the specific purpose and intent to permanently deprive

the Plaintiff of possession, use and benefit of Plaintiff's cashier's check. See *United States v.*

*Powell, 294 F. Supp. 1353, 1355 (E.D. Va. 1968); United States v. Dupee, 569 F.2d 1061 (9th*

*Cir. 1978).*

165.    As a direct and proximate result of the acts and actions, committed and omitted by

the Defendants, and all of them, the Plaintiff has been caused to suffer harm and damages, to

include, but not limited to being permanently deprived of the use and benefit of a cashier's check

in the amount of $25,849.76, and other damages associated with, related to, and resulting from

being deprived of the check.

WHEREFORE, Plaintiff prays for relief as set forth below.

### SEVENTH CAUSE OF ACTION ( IN THE ALTERNATIVE) MISAPPROPRIATION OF FUNDS (As against all of the Defendants)

166.    Plaintiff incorporates by reference each paragraph set forth above as though set

forth verbatim herein this paragraph 166, and all paragraphs below.

167.    Defendants deliberately and intentionally misappropriated the cashier's check that

Plaintiff sent to the Defendant that the Plaintiff intended to be used for the specific purpose of

paying off the Plaintiff's home equity line of credit.

168.    The Plaintiff instructed the Defendant in no uncertain terms that the cashier's

check was intended to be used for the specific purpose of paying off Plaintiff's home equity line

of credit.

169.    The Defendants were at all times fully aware of the specific purpose for which the

Plaintiff's cashier's check was intended, and, the Defendants also understood the limits of the

authority the Plaintiff set, and agreed to, regarding the use of the check.

170.     The Defendants were at all times fully aware that the Plaintiff would vehemently disagree with, object to, and disapprove of any use of the cashier's check other than paying off the Plaintiff's home equity line of credit.

171.     Defendant, Specialized Loan Servicing, LLC, knowingly, intentionally, and deliberately fraudulently misappropriated, and used, Plaintiff's check for itself, or for some purpose other than paying off Plaintiff's home equity line of credit.

172.     As a direct and proximate result of the Defendants knowing, intentional, and deliberate, misuse and/or, fraudulent misappropriation of Plaintiff's cashier's check in the amount of $25, 849.76, the Plaintiff has been caused to suffer harm and damages, in the amount of the cashier's check, and other and further damages, financial, monetary, physical, emotional, and other.

WHEREFORE, Plaintiff prays for relief as set forth below.

### EIGHTH CAUSE OF ACTION (IN THE ALTERNATIVE) THEFT (As against all of the Defendants)

173.     Plaintiff incorporates by reference each paragraph set forth above as though set forth verbatim herein this paragraph 173.

174.     Defendants stole Plaintiff's cashier's check in the amount of $25,849.76.

175.     Defendants stole Plaintiff's cashier's check by knowingly exercising control over the check by the use of deception, lies, knowing concealment and other illegal and evasive tactics and actions, while so acting without authorization by the Plaintiff to take such actions, and, with the intent to permanently deprive the Plaintiff of the use or benefit of the check. See *Colorado Revised Statute, Title 8, Article 4, Part 4, Section 18-4-401, See also People v. Treat,*

Page - 35

*193 Colo 570, 568 P.2d 473, 475 (1977).*

176.     After exercising control over the cashier's check, as a condition for righting

the wrong of stealing the check, and correcting the circumstances resulting from the theft, SLS

demanded consideration from the Plaintiff in the form of a second cashier's check in the amount

of $25,849.76 being money to which the Defendant was not legally or otherwise entitled to

receive.

177.     As a direct and proximate result of the Defendants' act of theft of Plaintiff's

cashier's check in the amount of $25,849.76, Plaintiff has been caused to suffer harm and

damages, monetarily in the amount of the cashier's check, and more, and additionally in other

ways.

      **WHEREFORE,** Plaintiff shall pray for relief as set forth below.

**NINTH CAUSE OF ACTION**
**EXTORTION**
**(As against all the Defendants)**

178.     Plaintiff incorporates by reference each paragraph set forth above as though set

forth verbatim herein this paragraph 178.

179.     By their acts and actions as evidenced by the facts, the Defendants are liable for

attempting to extort the Plaintiff.

180.     Pursuant to Colorado Revised Statutes 18-3-207, the crime of extortion is

committed when, in order to induce another person to do something against his or her will, or, to

refrain from performing a lawful act, or, to give money to the person demanding the money, or

anything else of value, or, make a substantial threat against another person to cause economic

hardship, cause that person to suffer bodily or mental harm, or damage that person's property or

Page - 36

reputation, and, the person threatens such consequences by: performing or causing an unlawful

act to be performed, or invoking action by a third party, whose interests are not substantially

related to the person making the threat or to that person's interest. See also;

*United States v. Hooks, 2005 U.S. Dist . (W.D.Tenn. Dec. 12, 2005)*

181.    A substantial threat is one that is reasonably likely to induce a belief that the

threat will be carried out, and threatens significant confinement, restraint, injury, or damage.

See CRS.

182.    At all times relevant to this complaint the Defendant SLS communicated to the

Plaintiff that if the Plaintiff did not send the Defendant a second cashier's check, or pay other

and additional amounts of money that were then not owing by the Plaintiff, and of which the

Defendant had no legal right, or any other right of any nature or of any kind,  to receive the

Defendant would provide, and would continue to provide, derogatory credit information about

the Plaintiff to various credit reporting agencies, and, would also initiate foreclosure actions

against Plaintiff's home and Plaintiff's property. See *People v. Oppenheimer, 209 Cal. App. 2d*

*413 (Cal. App. 2d Dist. 1962)*

183.    The Plaintiff felt forced against his will to capitulate to the Defendants threats,

and other of the Defendant's outrageous and oppressive actions, including ruining Plaintiff's

credit, and defaming the Plaintiff's reputation, causing the Plaintiff to suffer economic harm.

184.    As a direct and proximate result of the Defendant's outrageous and oppressive

conduct and actions, and threats of harm, the Plaintiff has suffered financial, physical and mental

harm and damages. See *State v. Taylor, 30 Wn. App. 89 (Wash. Ct. App. 1981)*

**WHEREFORE** the Plaintiff shall pray for relief as set forth below.

Page - 37

### TENTH CAUSE OF ACTION
### MALICIOUS & INTENTIONAL
### INFLICTION OF EMOTIONAL/ AND MENTAL STRESS
### (As against all of the Defendants)

185.    Plaintiff incorporates by reference each paragraph set forth above as though set

forth verbatim here in this paragraph.

186.    At all times relevant to this complaint the Defendant, and each of them, engaged

in outrageous and oppressive conduct in their relationships and interactions with the Plaintiff.

187.    At all times relevant to this complaint the Defendants, and each of them, acted

with willful and wanton malice, and with great indifference to the rights of the Plaintiff, in their

interactions, in their dealings, and in their respective relationships with the Plaintiff.

188.    During a telephone conversation with Defendant's representative, the

representative yelled at the Plaintiff in a loud, angry, threatening and offensive tone of voice,

**"WHO CARES WHAT HAPPENED TO YOUR CHECK !"**

189.    The Defendants engaged in active concealment, deceit, and malicious

misrepresentation of material facts, the disclosure and truth of which were essential for the

protection of the rights of the Plaintiff.

190.    The Defendant, SLS, knowingly, intentionally and deliberately lied about

receiving Plaintiff's cashier' check for the despicable and abominable purpose of allowing the

Defendants to perpetrate a fraud, and scam against the Plaintiff, with the intent of depriving the

Plaintiff of Plaintiff's cashier's check in the amount of $25,849.76, and also extorting additional

funds from the Plaintiff, ruining the Plaintiff's credit and thereby forcing the Plaintiff to become

dependent upon, and shackled to the predatory type, destructive mortgage "assistance" plans

being touted by the Defendants.

191.     The Defendants deliberately, knowingly, intentionally, willfully, wantonly, and maliciously engaged in egregious, outrageous, deceptive, fraudulent, unlawful, and oppressive-type behavior, acts, and actions, specifically intended for the purpose of harassing the Plaintiff, intimidating the Plaintiff, threatening the Plaintiff, *Reference Statement of Facts above.*

192.     As the facts show, by all acceptable, civilized standards, the Defendants' conduct was outrageous, and done with the intent, and purpose of causing the Plaintiff mental and emotional stress.

193.     In January 2020, the Plaintiff was admitted to the emergency department at a local hospital for conditions and symptoms associated with, and etiologically connected to stress-based causations.

194.     As a direct and proximate result of the Defendants' outrageous conduct, the Plaintiff suffered physical, mental and emotional distress, and, consequently, was caused to be admitted to a hospital under emergency conditions.

**WHEREFORE,** Plaintiff shall pray for relief as set forth below.

## ELEVENTH CAUSE OF ACTION
## DEFAMATION - LIBEL AND SLANDER
### (As against all of the Defendants)

195.     Plaintiff incorporates by reference each paragraph set forth above as though set forth verbatim in this paragraph.

196.     At all times relevant to this complaint, and, at all times prior hereto, the Plaintiff was, and remains, a natural, living person.

197.     At all times relevant to this complaint, and at times prior hereto, Plaintiff' had a

reputation among creditors, individuals within the community, and in the society, and others alike with whom he dealt, or with whom he did business, for paying all of his debts in a timely, consistent, and conforming manner.

198.    On July 15, 2019, and at times prior thereto, the Plaintiff enjoyed a debtor creditor relationship in the form of a home equity line of credit, and, a residential mortgage, with Bank of America.

199.    Plaintiff's credit history with Bank of America was impeccable in all respects as it pertained to Plaintiff's home equity line of credit and residential mortgage, with no history whatsoever of late, missed, or nonconforming payments ever being recorded.

200.    According to payment records, not in dispute at this time, on September 17, 2019, the balance then owing on Plaintiff's home equity line of credit was $25,849.76, in its entirety.

201.    On July 15, 2019, Plaintiff received correspondence from Bank of America notifying Plaintiff that "on August 1, 2019, Specialized Loan Servicing, LLC, will become the service provider for your home equity line of credit".

202.    On August 23, 2019, Plaintiff received a pay-off statement from Specialized Loan Servicing, LLC, advising Plaintiff that as of August 23, 2019, the total pay-off amount of Plaintiff's home equity line of credit was $25,849.76 in its entirety.

203.    On August 27, 2019, Plaintiff mailed a cashier's check to SLS in the amount of $25,849.76, with specific instruction that the check was to be used by the Defendant to pay off Plaintiff's home equity line of credit.

204.    U.S. Postal Service delivery records indicate that On August 30, 2019, at 10:49

Page - 40

am, Plaintiff's cashier's check was delivered to, and received by Specialized Loan Servicing, LLC, at the address of 8742 Lucent Blvd, Suite 300, Highlands Ranch, (Littleton), Colorado 80129.

205.     On August 31, 2019, the following day after Plaintiff's home equity line of credit was paid off in full, Plaintiff received a "payment due" statement from SLS indicating that on September 25, 2019, a payment would become due on Plaintiff's home equity line of credit.

206.     On August 31, 2019, when the Defendant sent Plaintiff a "payment due" notice, the Defendant was, at that time, fully aware that Plaintiff's home equity line of credit was paid off in full and there was no payment in any amount remaining due and payable on the account.

207.      At all times relevant to this complaint, based upon first-hand, irrefutable information being known personally by the Defendant, the Defendant knew it to be true that the Plaintiff's home equity line of credit was paid off in full on August 30, 2019, at 10:49, am, and therefore, there was no amount, outstanding, or remaining to be paid on Plaintiff's account.

208.     On August 31, 2019, based upon first-hand, irrefutable information being known personally by the Defendant, the Defendant knew to be completely and patently false, any statement, or any allegation in any form, which indicated, claimed, or asserted, that there was any amount remaining due, past due, delinquent, or to be paid in the future, on Plaintiff's home equity line of credit.

209.     Though having uncontestable information to the contrary, and knowing it other wise to be patently false, and incorrect, the Defendant knowingly, intentionally, deliberately, maliciously, and wantonly provided, communicated, published, broadcasted, false

Page - 41

and derogatory credit information about the Plaintiff to various credit reporting agencies, and to others. See, *Colorado Revised Statutes Section 13-80-103, See also, Keohane v. Stewart, 882 P.2d 1293 (Colo. 1994)*

210.　　The Defendant has continued consistently to provide false and derogatory credit information about the Plaintiff beginning on, or about, September, 2019, and continuing through, and including the time of this complaint, February, 2021.

211.　　The acts and actions, done and committed by the Defendants in this case, that caused the Plaintiff to suffer harm and damages, were performed with evil intent, and with the purpose of injuring the Plaintiff, and, with a wanton and reckless disregard of Plaintiff's rights, as evidence of a wrongful motive.

212.　　The Defendants' acts and actions created a substantial risk of harm to the Plaintiff and their acts and actions were purposely performed with an awareness of the risk in total and absolute disregard of the consequences. See *Western Fire Truck, Inc., v. Emergency One, Inc., 134 P.3d 570 (2006); A.B. ex rel. B.S. v. Adams - Arapahoe 28J School Dist., 831 F. Supp. 2d 1226 (2011); CRS 13-21-102.*

213.　　As a direct and proximate result of the Defendant's acts, actions and omissions, as set forth and described herein above, the Plaintiff has suffered harm and damages in the form of economic loss(es), damage to his reputation, damage to his credit reputation, emotional, mental and physical distress, and more.

## **JURY DEMAND**

**PLAINTIFF RESPECTFULLY DEMANDS TRIAL BY JURY OF ALL ISSUES SO TRIABLE.**

**WHEREFORE,** the Plaintiff shall pray for relief as set forth below.

1. For Judgment for money damages, of all kinds awardable, against the Defendants, each and all of them, jointly and severally, in amounts that are fair and just, but **not less than $5,000,000.00** against each individual Defendant,

2. For all costs associated with bringing and litigating this action to final conclusion, including reasonable attorney's fees, and costs of discovery, and appeal if necessary,

3. For an Order permanently enjoining and restraining the Defendants from taking any further actions with regard to any issues raised in this case,

4. Award pre-and post-judgment interest to the extent provided by law,

5. For an order that the defendants forthwith correct, and scrub clean, Plaintiff's credit history, and,

6. For such other and further relief as may be deemed appropriate, equitable and just.


Respectfully submitted


James Harrison Massey, Pro Se
440 Claypool Boyce Road
Alvaton, KY 42122
Telephone: 270-791-3528
Fax: 270-783-0898
jimmassey.pi.atty@gmail.com

## VERIFICATION

I, **JAMES HARRISON MASSEY**, the Plaintiff in this case, have read the foregoing complaint, and know, or believe that all allegations that the Plaintiff has personal knowledge of to be true.

Plaintiff believes the allegations that the Plaintiff does not have personal knowledge of to be true based on specific information, documents, or both.

James H. Massey

## NOTARY

Subscribed and sworn to before me by James Harrison Massey on this 19th   day of February, 2021.

Seal

Notary Public

My commission expires August 17, 2024

TAMARA S. MASSEY
MY COMMISSION EXPIRES
NOTARY
PUBLIC
ID KYNP13193
AUGUST 17, 2024
COMMONWEALTH OF KENTUCKY